# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### JANUARY 19, 2010 Session

## JOSEPH KEVIN ADAMS v. TENNESSEE FARMERS MUTUAL INSURANCE COMPANY

### Direct Appeal from the Circuit Court for Chester County
No. 07-4611      Roy B. Morgan, Judge

---

### No. W2009-00931-COA-R3-CV - Filed April 13, 2010

---

The plaintiff made a claim under his homeowner's insurance policy after his house burned. The insurer denied the claim because, after the policy was issued, the plaintiff deeded the property to his sons so that it would pass to them if he died, and he did not notify the insurer. The plaintiff sued the insurer for breach of contract. The insurer claimed that the plaintiff had no insurable interest in the property, that he breached a "warranty of ownership" under the policy, that he had a duty to disclose the change of ownership after the policy issued, and that he violated a provision of the policy addressing concealment and fraud. The trial court ruled in favor of the plaintiff and ordered the insurer to pay him approximately $72,000 in accordance with the policy limits. The trial court also awarded discretionary costs to the plaintiff, but it denied the plaintiff's request for prejudgment interest. The insurer appeals, claiming that the plaintiff was not entitled to recover under the policy for various reasons, and that the trial court erred in awarding the plaintiff discretionary costs. The plaintiff contends that the trial court erred in declining to award prejudgment interest. We affirm the trial court's award pursuant to the insurance policy and its award of discretionary costs, and we vacate the portion of the judgment denying the request for prejudgment interest and remand for such an award.

### Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed in Part, Vacated in Part and Remanded

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which DAVID R. FARMER, J., and J. STEVEN STAFFORD, J., joined.

Charles L. Trotter, Jr., Huntingdon, Tennessee, for the appellant, Tennessee Farmers Mutual Insurance Company

J. Brandon McWherter, Clinton H. Scott, Jessica F. Salonus, Jackson, Tennessee, for the appellee, Joseph Kevin Adams

**OPINION**

## I.  FACTS & PROCEDURAL HISTORY

In 1992, Joseph Kevin Adams ("Mr. Adams") purchased a house and land in Chester County, Tennessee.  Although Mr. Adams paid the purchase price and planned to reside at the property, he had his oldest son's name placed on the deed instead of his own.  According to Mr. Adams, he was living with a woman who had "problems," and he wanted to ensure that the property would pass to his sons if something happened to him because he did not have a will.  Mr. Adams worked as a construction worker and pipe welder, and he had previously lost his legs in an accident at work and had seen several co-workers lose their lives.

When Mr. Adams went to apply for homeowner's insurance with Tennessee Farmers Mutual Insurance Company ("Tennessee Farmers"), he explained the situation with the deed to his insurance agent.  Mr. Adams filled out the insurance application, which asked for the insured's name "as shown on trust or warranty deed," and accordingly, Mr. Adams listed his son as the insured.  Mr. Adams paid the premium, and the policy issued.

The son whose name was on the deed, Shane Adams, was eighteen years old at the time and lived and worked in another state.  Mr. Adams told Shane about the deed after the transaction had been completed.  Mr. Adams' younger son, Dustin, resided with Mr. Adams in Chester County.  When Dustin turned eighteen, Mr. Adams instructed Shane to execute a deed conveying a one-half interest in the property to Dustin.  Shane executed the deed as instructed, and it was recorded.  Mr. Adams then went to the office of Tennessee Farmers and instructed his agent to add Dustin as an additional insured on the policy issued to Shane, which the agent did.  Dustin moved out of Mr. Adams' residence in 1998 or 1999.

In 2000, Mr. Adams moved to California for work, and he instructed his sons to deed the Chester County property back to him so that he could use it as collateral to secure a loan to purchase property in California.  Shane and Dustin executed a warranty deed conveying the property to Mr. Adams as instructed, and the deed was recorded.  No money changed hands with the transfer.

Mr. Adams arranged to have a house sitter for the Chester County property, but when he notified Tennessee Farmers of the situation, he was told that he could not allow other people to live there while he was away without changing the insurance policy. Mr. Adams then submitted an application for standard fire insurance with Tennessee Farmers, listing himself as the applicant "as shown on trust or warranty deed," and Tennessee Farmers issued the policy.

When Mr. Adams returned from California two years later and moved back into the Chester County residence, he submitted a new application for homeowner's insurance with Tennessee Farmers. This application did not contain the same language requesting the insured's name "as shown on trust or warranty deed." The new application stated, "Notice: Applicant(s) must have an ownership (and name all owners of record) or insurable interest in the property for which application is being made." Mr. Adams listed himself and his wife[1] as the applicants, he paid the premium, and Tennessee Farmers issued a homeowner's insurance policy effective December 6, 2002. The policy was subsequently renewed on a yearly basis, with Mr. Adams paying the premiums.

On December 22, 2005, Mr. Adams conveyed the property back to Shane and Dustin by warranty deed, without consideration, and the deed was recorded. According to Mr. Adams, the property was supposed to be in his sons' names all along in case something happened to him. Mr. Adams subsequently instructed Dustin to convey his one-half interest in the property to Shane in case Shane needed to use the property as collateral to secure a loan. On May 30, 2006, Dustin executed a quitclaim deed, which was also recorded, conveying his interest in the property to Shane as instructed by Mr. Adams. However, Shane never used the property as collateral or for any other reason.

Regardless of the state of the record title over the years, Mr. Adams lived in the house, maintained the property, and treated it as his own. He paid the real estate taxes, insurance premiums, utility bills, costs of improving the house, and other expenses. Mr. Adams controlled who came on and off the property and what went on there. According to Shane and Dustin, they never claimed any ownership interest in the property, but considered it their father's.

On October 15, 2006, the dwelling and outbuildings on the property were totally destroyed by fire. Mr. Adams made a claim under his homeowner's policy, but Tennessee Farmers denied the claim upon discovering that Mr. Adams had executed the warranty deed

---

[1] Although Mr. Adams listed his current wife as an insured under the policy, they subsequently divorced, and she disclaimed any rights she might have under the policy as an insured. Therefore, her rights are not at issue in this case.

conveying the property to his sons. Tennessee Farmers maintained that Mr. Adams had no insurable interest in the property at the time of the fire. Tennessee Farmers paid Mr. Adams' claim for the loss of his personal property in the residence, concluding that the deed had no effect on the personal property he owned.

Mr. Adams filed a complaint for breach of contract against Tennessee Farmers. Both parties moved for summary judgment. Tennessee Farmers contended that Mr. Adams had no insurable interest in the property, that he breached a warranty to Tennessee Farmers that he owned the property, that he breached a duty to Tennessee Farmers to notify it of matters material to the risk arising subsequent to the issuance of the policy, and that he violated the "Concealment or Fraud" provision of the policy. Mr. Adams asserted that he had an insurable interest in the property, that he had no duty to notify Tennessee Farmers of changes in the legal title to the property, and that he did not violate the "Concealment or Fraud" provision. Following a hearing, the trial court found as a matter of law that Mr. Adams made no warranty to Tennessee Farmers and therefore did not breach a warranty, that Mr. Adams had no duty to disclose the change in ownership, and that Mr. Adams did not conceal or misrepresent material facts in violation of the "Concealment or Fraud" provision of the policy. However, the court determined that there were genuine issues of material fact remaining as to whether Mr. Adams had an insurable interest in the property. Therefore, the court denied both parties' motions for summary judgment.

Following a bench trial, the trial court entered an order finding that Mr. Adams did have an insurable interest in the property, and the court ordered Tennessee Farmers to pay Mr. Adams $66,400 pursuant to the insurance policy. The court denied Mr. Adams' request for prejudgment interest. Tennessee Farmers filed a motion to alter or amend, or in the alternative, for a new trial, which was denied. Mr. Adams also filed a motion to alter or amend requesting that the court increase the judgment by $6,100 in accordance with the policy limits, which Tennessee Farmers agreed was proper based upon Tennessee's "valued policy statute." Mr. Adams filed a motion for discretionary costs, which the court granted in the amount of $2,933.20. The trial court entered an amended final judgment reflecting a total award to Mr. Adams of $75,473.20. Tennessee Farmers timely filed a notice of appeal.

## II. ISSUES PRESENTED

Tennessee Farmers presents the following issues, as we perceive them, for review on appeal:

1. Whether the trial judge erred in concluding that Mr. Adams had an insurable interest in the property;
2. Whether the trial judge erred in failing to find that ownership was a warranty in the

insurance policy under "Coverage A – Dwelling," which Mr. Adams breached;

3.   Whether the trial judge erred in failing to find that Mr. Adams breached a duty owed to Tennessee Farmers to disclose a change of ownership after the issuance of the policy;

4.   Whether the trial judge erred in determining that Mr. Adams did not violate the "Concealment or Fraud" provision of the policy by misrepresentations on the Sworn Statement in Proof of Loss;

5.   Whether the trial judge erred in awarding Mr. Adams the entire policy proceeds; and

6.   Whether the trial judge erred in awarding Mr. Adams discretionary costs.

Additionally, Mr. Adams presents the following issue for review:

7.   Whether the trial judge erred in refusing to award prejudgment interest.

For the following reasons, we affirm the circuit court's award pursuant to the insurance policy and its award of discretionary costs, and we remand the case for an award of prejudgment interest.

## III.   DISCUSSION

### A.   Insurable Interest

"It is essential to the validity of an insurance contract that the insured have an 'insurable interest'[2] in the property insured; otherwise, the contract 'amounts to no more than

---

[2] As explained by one Court,

An insurable interest is the relationship or connection a person must have with the subject matter of an insurance policy in order to insure it. The insurable interest doctrine developed over the course of several centuries in response to certain public policy concerns related to insurance. The foremost historical justification for the insurable interest requirement was to prohibit wagering contracts in the guise of insurance. Odd as it may strike us today, insurance as an instrument of wagering was a common and accepted practice in mid-eighteenth century England. Parliament, responding to the pernicious effects of this practice, passed a series of statutes beginning in the middle of the eighteenth century requiring as a prerequisite for the validity and enforceability of an insurance contract that the insured have an interest in the contract's subject matter. While the historical anti-wagering foundation of the insurable interest doctrine remains valid, other public policy objectives have greater resonance today. The distinction between wagering and insurance is now so firmly established in public perception, that the justification for the insurable interest doctrine is more readily apprehended today as the prevention of unproductive and

(continued...)

a wager and is void because of violation of public policy.'" ***Estate of Cartwright v. Standard Fire Ins. Co.***, No. M2007-02691-COA-R3-CV, 2008 WL 4367573, at \*5 (Tenn. Ct. App. Sept. 23, 2008) *perm. app. denied* (Tenn. Apr. 27, 2009) (quoting *Duncan v. State Farm Fire & Cas. Co.*, 587 S.W.2d 375, 376 (Tenn. 1979)). In Tennessee, "'one has an insurable interest in property if by its continued existence he will gain an advantage, or if by its damage or destruction he will suffer a loss, whether or not he has any title in, lien upon or possession of the property.'" ***Brewer v. Vanguard Ins. Co.***, 614 S.W.2d 360, 364 (Tenn. Ct. App. 1980) (quoting *Duncan*, 587 S.W.2d at 375). "[E]ven though ownership does not rise to the dignity of a legal title the interest may be insurable." ***Am. Indem. Co. v. S. Missionary Coll.***, 260 S.W.2d 269, 274 (Tenn. 1953). In other words, the insured need not have absolute and unqualified ownership of the property in order to have an insurable interest. ***Estate of Cartwright***, 2008 4367573, at \*5 (citing *Baird v. Fidelity-Phenix Fire Ins. Co.*, 162 S.W.2d 384, 390 (Tenn. 1942)). Generally, anyone who derives a benefit from the existence of property or who would suffer loss from its destruction has an insurable interest in the property. ***Id.*** "Even a contingent interest may constitute an insurable interest." ***Am. Indem. Co.***, 260 S.W.2d at 271. "Any interest in property, legal or equitable, qualified, conditional, contingent, or absolute, or merely the right to use the property, with or without the payment of rent, is sufficient." ***Brewer***, 614 S.W.2d at 364 (quoting 3 *Couch on Insurance 2nd*, § 24:13 at 88).

We find the relevant facts of the case before us similar to those in ***Smith v. Amerisure Insurance Co.***, No. 03A01-9510-CV-00370, 1996 WL 269461 (Tenn. Ct. App. May 22, 1996) *perm. app. denied* (Tenn. Oct. 21, 1996). In that case, a husband and wife owned a residence in which they lived. ***Id.*** at \*1. After a creditor threatened to take their house, they deeded their residence to their adult son for no consideration. ***Id.*** The husband and wife continued to reside in the home and paid the mortgage, insurance premiums, and taxes, while their son retained his own residence. ***Id.*** The husband and wife failed to give notice to their insurer about the change in ownership. ***Id.*** When a fire destroyed the home, their insurer refused to pay the claim upon discovering that the husband and wife no longer owned the home, claiming that they had no insurable interest in the home at the time of the fire. ***Id.*** at \*2. The trial court agreed and granted summary judgment to the insurer. The Court of Appeals reversed, finding that the insureds' claim could not be denied for lack of an insurable interest. ***Id.*** at \*3. The Court explained that "[a] person is not required to have 'title to or possession of property in order to have an insurable interest in the property if by

---

[2](...continued)

wasteful commercial transactions, the limitation of insurance to true indemnity, and the deterrence of the fraudulent destruction of insured property.

***Delk v. Markel Am. Ins. Co.***, 81 P.3d 629, 633-635 (Okla. 2003) (footnotes omitted).

its continued existence he will gain an advantage, or if by its damage or destruction he will suffer a loss.'" *Id.* (quoting *Oliver v. Johnson*, 692 S.W.2d 855 (Tenn. Ct. App. 1985)). The Court found that the husband and wife "certainly suffered an economic loss" by the home's destruction, as they no longer had a home in which to live. *Id.* In sum, "by simply living in the home," the husband and wife had a sufficient insurable interest. *Id.*; *see also Brewer*, 614 S.W.2d at 363-64 (finding that a mother had an insurable interest in a home owned by her daughter because the mother was living there and taking care of it); *Phoenix Ins. Co. v. Brown*, 381 S.W.2d 573, 575 (Tenn. Ct. App. 1964) (finding an insurable interest where a man conveyed property to his ex-wife but was "looking after" it for her at the time of the fire).

Likewise, in this case, we find that Mr. Adams had an insurable interest in the residence where he lived, as he certainly benefitted from its continued existence and suffered a loss by its destruction.

We note that Tennessee Farmers claims that Mr. Adams cannot have an insurable interest in the property because Tennessee Code Annotated section 66-5-101 provides:

> Every grant or devise of real estate, or any interest therein, shall pass all the estate or interest of the grantor or devisor, unless the intent to pass a less estate or interest shall appear by express terms, or be necessarily implied in the terms of the instrument.

Tennessee Farmers contends that because Mr. Adams deeded the property to his sons, he retained no interest in it. It is true that we do not presume the existence of an insurable interest in the property after alienation; rather, we presume that all rights, title and interest of the grantor were conveyed. *See Estate of Cartwright*, 2008 WL 4367573, at *6. However, the insured may present other evidence demonstrating the existence of an insurable interest. Again, an insurable interest can be "[a]ny interest in property, legal or equitable, qualified, conditional, contingent, or absolute, or merely the right to use the property, with or without the payment of rent[.]" *Brewer*, 614 S.W.2d at 364. Clearly, it is not necessary for an interest to be expressly stated on the face of a deed in order for the interest to be insurable. Tennessee Farmers' argument to the contrary is without merit.

### B. Warranty of Ownership

Tennessee Farmers also argues that "ownership is a warranty in the insurance policy **Coverage A – Dwelling** which [Mr. Adams] breached." The trial judge concluded that Mr. Adams made no such warranty to Tennessee Farmers. Again, Mr. Adams was the owner of the property in all respects, including record title, when he applied for the homeowner's

policy at issue in 2002. It was not until 2005 that he deeded the property to his sons.

We note at the outset that this policy did not contain a "sole and unconditional ownership" clause as seen in many insurance policies. *See, e.g.*, ***Alfred v. Bankers' & Shippers' Ins. Co.***, 68 S.W.2d 941, 941-42 (Tenn. 1934) (involving a policy providing that it would be void "if the interest of the insured be other than unconditional and sole ownership; or if the subject of insurance be a building on ground not owned by the insured in fee simple"). "There are cases almost without number dealing with the question of 'sole and unconditional ownership' of property where the insurer insisted upon a forfeiture because of an invalid title, or no legal title, or no title at all in the policy holder." ***Am. Indem. Co.***, 260 S.W.2d at 274. However, this policy contained no such language, nor did it contain an express condition against alienation or changes of title or interest.[3]

Mr. Adams' policy contained the following provisions:

By accepting this policy **you** warrant and agree that:
1. the statements in the application(s) for this insurance are **your** statements and are true; and
2. the statements in the Declarations are based on **your** statements and are correct;[4] and
3. **we** insure **you** in reliance upon **your** statements; and
4. this policy contains all of the agreements and understandings between **you** and **us** or any of **our** agents; and
5. **you** will pay premiums when due and comply with all **terms** of the policy; and
6. each endorsement listed by number in the Declarations is part of this policy and modifies this policy according to the provisions of that endorsement.

However, Tennessee Farmers argues that a "warranty of ownership" existed in the "**Coverage A – Dwelling**" section of the policy, which provides:

---

[3] The policy did address occupancy of the property, providing that it would become automatically void "if all insureds discontinue occupancy of the residence premises and give permission to anyone else to occupy the residence premises without our prior written consent." (emphasis omitted).

[4] Tennessee Farmers did not dispute that the statements on Mr. Adams' application were correct and that the statements in the Declarations, which were based on the statements in the application, did not contain a line item addressing ownership of the property.

**SECTION I**

. . . .

**Coverage A – Dwelling**

  What Property is Covered

    **We** cover:

  1.    **Your residence.**

    . . . .

The policy defined "you" and "your" to mean "the person or entity identified as 'INSURED NAME' in the Declarations and that person's spouse if a resident of the same household." The policy defined "residence" as "the one or two family dwelling owned by you, described in the Declarations, and occupied by you as your personal dwelling.  It includes structures attached to the dwelling."  Based upon the policy's definition of "residence" as a dwelling "owned by you," Tennessee Farmers asserts that Mr. Adams warranted that he owned the residence as record title holder.  Tennessee Farmers' argument, as we understand it, is that this definition gave rise to a continuing warranty, which Mr. Adams breached when he later conveyed the property to his sons.

Mr. Adams, on the other hand, argues that there is no warranty in the policy that would require him to continue to hold record title to the property.  He points out that the policy does not define the terms "own," "owned," or "ownership," and that the application for insurance stated that the applicant must have "an ownership . . . *or insurable interest* in the property for which application is being made."  (emphasis added).  The policy also contained the following provision:

**Conditions Applying to SECTION I**

Insurable Interest

      If more than one person or entity has an insurable interest in covered property and **we** are obligated to pay for a loss to the covered property, **we** will pay only the **insured's** individual interest in the covered property at the time of loss up to the applicable limit of liability.

Thus, Mr. Adams contends that, "to the ordinary person reading the Policy, one is insured as long as he or she 'owns' an interest in the Property or has an 'insurable interest' in the Property."

A warranty is "a stipulation inserted in writing on the face of a policy, on the literal truth or fulfillment of which the validity of the entire contract depends."  ***Boyd v. Vanderbilt Ins. Co.***, 16 S.W. 470, 470 (Tenn. 1891).

"No particular form of words is necessary to constitute a warranty. Any statement or stipulation upon the literal truth or fulfillment of which, in the intention of the parties, the validity of the contract is made to depend, * * * amounts to a warranty. But no particular form of words will make a statement or stipulation a warranty, not even the use of the word 'warranty,' where it is apparent from the context or from the other parts of the contract that it is not the intention of the parties to make the validity of the contract depend on the literal truth or fulfillment of the statement or stipulation." May, Ins. § 156.

*Standard Life & Acc. Ins. Co. v. Lauderdale*, 30 S.W. 732, 734 (Tenn. 1895).  "Warranties are not favored by construction." *Hunter v. U.S. Fid. & Guar. Co.*, 167 S.W. 692, 695 (Tenn. 1914) (citing *Joyce on Insurance*, § 1949; 019 Cyc. 684); *see also* 6 Lee R. Russ and Thomas F. Segalla, *Couch on Insurance* § 83:1 (3d ed. 2009) ("[C]ourts do not favor warranties, and a statement as to conditions does not constitute a warranty unless the language of the policy, construed strictly against the insurer, requires such an interpretation.) "A statement constituting a warranty is susceptible of no construction other than that the parties mutually intend that the policy should not be binding unless such statement is literally true."  44 Am. Jur. 2d *Insurance* § 1033 (2010).

On appeal, Tennessee Farmers refers us to two cases from other jurisdictions which, according to Tennessee Farmers, involved warranties of ownership.  Having reviewed those cases, however, we find them distinguishable because the policies at issue there contained specific "sole and unconditional ownership" clauses, and this policy does not.  *See Hudson Cas. Ins. Co. v. Garfinkel*, 161 A. 195, 196 (N.J. 1932); *Old Reliable Fire Ins. Co. v. Alduro-Raynes Arabians, Inc.*, 717 S.W.2d 124, 126 (Tex. App. 1986) ("An insured is said to warrant sole ownership when the policy provisions make sole ownership a condition precedent to liability on the insurance policy and state that the policy is void if the named insured is not the exclusive owner.").

Considering the language in the instant policy, it is not clear to this Court that the parties intended to make the validity of the entire contract depend upon whether Mr. Adams retained record title to the property.  As stated recently by our Supreme Court, "In our view, the insurer is essentially asking us to write a new contract for the parties in accordance with its idea of what the policy should have said.  This we decline to do, as our duty is to construe and enforce the policy as written, not make a new contract for the parties on different terms." *U.S. Bank, N.A. v. Tenn. Farmers Mut. Ins. Co.*, 277 S.W.3d 381, 390 (Tenn. 2009).  In sum, we reject Tennessee Farmers' assertion that Mr. Adams breached a "warranty of ownership."

### C. Duty to Disclose Changes After Issuance of the Policy

Next, Tennessee Farmers contends that Mr. Adams breached a duty he owed to Tennessee Farmers to disclose the change in ownership after issuance of the policy. Again, we begin by noting that nothing in Mr. Adams' policy specifically stated that he was required to notify Tennessee Farmers of changes in title or interest.

When Mr. Adams applied for the homeowner's policy in 2002, the application that he completed contained thirty questions to be answered on behalf of all applicants and residents of the applicant's household, and Question 13 asked, "Any other party have an ownership or other interest, of any type, in this property? (Give name and interest)." Mr. Adams responded, "No," which, at the time, was correct. Nothing in Mr. Adams' policy or application specifically stated that the insured had a duty to notify the insurer if the information provided on the application changed after the policy issued. Nevertheless, Tennessee Farmers argues on appeal that Mr. Adams had a duty to notify it of matters material to the risk subsequent to the issuance of the policy due to the duty of good faith and fair dealing. It further contends that Mr. Adams' failure to notify it of the conveyance violated the policy's "Concealment or Fraud" provision, which states:[5]

## ACTS WHICH AUTOMATICALLY VOID THE POLICY

### Concealment or Fraud

The policy shall be automatically void as to all **insureds** if any **insured**, whether before or after a loss or **occurrence**:
1.  conceals or misrepresents any material fact or circumstances relating to this policy;
2.  makes false statements relating to this policy;
3.  commits fraud relating to this policy.

In sum, Tennessee Farmers contends that the change in ownership was a material fact, that Mr. Adams had a duty to notify it of material facts after the policy issued, and that his failure to do so constituted concealment.

Mr. Adams contends that nothing in the policy expressly or implicitly required him

---

[5] Tennessee Farmers also relies upon a section from the *Restatement (Second) of Torts* dealing with misrepresentations by nondisclosure, which we find inapplicable to this action based solely upon breach of contract. The cases cited by Tennessee Farmers construing the Restatement section involved the tort of negligent misrepresentation by nondisclosure and were not based upon a breach of contract.

to supplement disclosures made on his application after the policy issued. According to Mr. Adams, accepting Tennessee Farmers' position would mean that the duty of supplementation would be endless, leaving insureds to determine what matters are "material" and subject to disclosure after a policy issues, and allowing insurers to routinely deny coverage for nondisclosure. Mr. Adams contends that the burden should be placed on insurers to either request information periodically or specify in policies when insureds must notify them of certain information.

It is clear that in completing an application for insurance, the insured has a duty to disclose information which is material to the risk involved. *See, e.g.*, ***Spellmeyer v. Tenn. Farmers Mut. Ins. Co.***, 879 S.W.2d 843, 846 (Tenn. Ct. App. 1993). As such, if Mr. Adams had misrepresented his interest in the property on his application, he would have been unable to recover on the policy. *See* ***Tenn. Farmers Mut. Ins. Co. v. Farrar***, No. E2008-00779-COA-R3-CV, 2009 WL 1162603, at *5 (Tenn. Ct. App. Apr. 30, 2009); ***Tenn. Farmers Mut. Ins. Co. v. Townsend***, No. 03A01-9406-CH-00227, 1994 WL 672610, at *1 (Tenn. Ct. App. Dec. 1, 1994) ("It is the rule of long standing in this jurisdiction that a policy holder's misrepresentation as to the ownership of property is held as a matter of law to increase the risk of loss and void the policy.") However, Tennessee Farmers' argument that Mr. Adams "concealed" the conveyance presupposes that he had a duty to inform Tennessee Farmers of information arising after the policy was issued, so that his silence constituted a misrepresentation.

Our research has not revealed any Tennessee cases considering whether an insured has a duty to supplement the disclosures made on an application for insurance after a policy has been issued. However, we have stated that "[i]t is established in Tennessee that a representation made in an application for insurance is a continuing affirmation of the truthfulness of such representations *until the policy is delivered*." ***State Farm Life Ins. Co. v. Lawless***, 586 S.W.2d 468, 470 (Tenn. Ct. App. 1979) (emphasis added) (citing *Indep. Life Ins. Co. v. Russell*, 80 S.W.2d 846, 847 (Tenn. Ct. App. 1934)).

Several other jurisdictions have considered the issue and concluded that the insured has no duty to notify the insurer of new information arising after the policy has issued absent an obligation in the policy or other request for the information from the insurer. For instance, the Supreme Judicial Court of Maine has held that, "[a]bsent a special agreement, the insured who makes particular representations in the application for insurance is not obligated to inform the insurer of changes in circumstances occurring after issuance of the policy which are inconsistent with the representations in the application." ***Patrons Mut. Ins. Co. v. Rideout***, 411 A.2d 673, 678 (Me. 1980). The Appeals Court of Massachusetts similarly concluded that "unless a provision in the insurance policy or a renewal application requires the insured to notify the insurer of particular changes, the insured is under no duty to identify

changes that are material and notify the insurer of such changes." ***Quincy Mut. Fire Ins. Co. v. Quisset Props., Inc.***, 866 N.E.2d 966, 968 (Mass. App. Ct. 2007).[6] Tennessee and Massachusetts have substantially similar statutes addressing misrepresentations made by an insured either in the negotiation of a contract of insurance or on an insurance application, but neither statute specifically addresses whether an insured must notify the insurer of changes in his or her information after the policy has issued.[7] The Massachusetts Court explained:

> Whether [the insured's] silence amounts to a misrepresentation turns on whether the obligation is one of inquiry by the insurer or sua sponte disclosure by the insured when neither a policy provision nor a renewal application or questionnaire requires such information of an insured. Does an insurer have a duty to identify and ask its insured for information that it deems material (relevant to the risks being underwritten during the period of insurance or renewal)? Or does the insured have a duty to identify what is material and notify the insurer of such changes from prior policy periods?
>
> We conclude that, when neither a policy provision nor a renewal application requires the insured to provide updated information to the insurer, the insured's failure to do so is not a misrepresentation within the meaning of G.L. c. 175, § 186. In such circumstances, the onus is on the insurer to identify the information that it considers material and request from the insured updated information concerning any changes. Absent such obligation or request, the insured's silence is not a misrepresentation within the meaning of the statute. *See Liquor Liab. Joint Underwriting Assn. of Mass. v. AIM Ins.*

---

[6] ***Rideout*** involved a husband and wife who maintained an automobile insurance policy, and whose adult daughter divorced her husband and became a "resident of the household" several months after their policy was issued. 411 A.2d at 678. The husband and wife did not notify their insurer of the daughter's residence with them before she was in an automobile accident. ***Id.***

***Quisset Properties*** involved an automobile insurance policy issued to a corporation that was involuntarily dissolved after the policy was issued. 866 N.E.2d at 969. The son of the corporation's president and sole corporate officer eventually wrecked the vehicle. ***Id.***

[7] Tennessee's statute provides:

> No written or oral misrepresentation or warranty made in the negotiations of a contract or policy of insurance, or in the application for contract or policy of insurance, by the insured or in the insured's behalf, shall be deemed material or defeat or void the policy or prevent its attaching, unless the misrepresentation or warranty is made with actual intent to deceive, or unless the matter represented increases the risk of loss.

Tenn. Code Ann. § 56-7-103. The Massachusetts statute considered in ***Quisset Properties***, G.L. c. 175, § 186, was nearly identical.

*Agency*, 55 Mass. App. Ct. 715, 722-723, 774 N.E.2d 653 (2002) (insurer had opportunity and responsibility to inquire of agent or insured respecting information in insurance binder). *See also Zurich Gen. Acc. & Liab. Ins. Co. v. Flickinger*, 33 F.2d 853, 856 (4th Cir.1929) ("[I]t is well settled that statements in an application for a policy which is renewed relate to the time when the original policy was issued; and, if they were true at that time, it is no defense that they may not have been true later at the time of renewal").

We acknowledge that G.L. c. 175, § 186, itself does not speak directly to whether the burden is one of inquiry by the insurer or disclosure by the insured. However, nothing in that statute argues in favor of imposing an obligation of unsolicited disclosure on the insured, the failure of which is to be deemed a misrepresentation that could defeat coverage under the policy. In creating an affirmative defense for an insurer, the statute manifests a legislative purpose to protect insureds from forfeiture of coverage except in narrow circumstances. . . .

In these statutory predicates, we discern no legislative intent to impose a duty on an insured to speak about matters concerning which he has not been asked by the insurer. The insurer sets the parameters of the negotiation, deciding those risks that it wishes to insure and those that it does not. Unless the insurer advises the insured of matters that are important to it in the "negotiation" of the policy, and that increase the risk of loss, how is an insured to know what is important or increases the risk of loss? We doubt that the Legislature intended to make insureds de facto underwriters who risk forfeiture of coverage for failing to identify and volunteer changed circumstances that might increase the risk of loss to the insurer. The insured's silence is not a "misrepresentation" because the insurer is in the best position to ask for information that bears on its decision to insure. Likewise, at each renewal it may identify and call to the insured's attention those items that are material and for which changes should be called to its attention by way of written response.

. . . .

Recognized insurance treatises likewise speak to the appropriateness of placing the obligation of inquiry on the insurer. "[U]nless the insured is required to complete a new application, he or she has no duty of disclosure in connection with any policy renewals." Windt, *Insurance Claims and Disputes* § 2.28 (4th ed.2001). See 6 *Couch, Insurance* § 82.3 (3d ed.1996) ("Absent an express agreement to the contrary, the duty to disclose changes in conditions ceases once the application is approved and a policy issued, and the insured is not required to disclose any information thereafter acquired").

The relative knowledge and experience of the parties also counsels such an allocation of duty, as does the relative difficulty or ease with which the

burden may be satisfied. Insureds are not in a position to recognize risk-enhancing circumstances as readily as the insurer, who can more easily identify and evaluate circumstances that are material to the decision to underwrite and insure the risk. Information not asked for is presumably deemed immaterial. *See Stipcich v. Metropolitan Life Ins. Co.*, 277 U.S. 311, 316, 48 S.Ct. 512, 72 L.Ed. 895 (1928). Moreover, imposing the burden of inquiry on the insurer poses no undue burden and reduces, if not eliminates, the difficult determination of what is, or is not, material to the risk of loss from the perspective of an insurer. *See National Union Fire Ins. Co. of Pittsburgh v. Continental Ill. Corp.*, 643 F.Supp. 1434, 1442 (N.D.Ill.1986) (insured not required to update representations in application). *See also Preferred Risk Mut. Ins. Co. v. Hites*, 125 Ill.App.2d at 152, 259 N.E.2d 815 (absent inquiry by insurer, no obligation on insured to volunteer facts that might affect insurer's decision to carry the risk).

*Quisset Properties, Inc.*, 866 N.E.2d at 971-73 (footnote omitted). According to *Couch on Insurance*, "[t]he failure of the insured to inform the insurer of acts or conditions occurring after issuance or renewal of the policy will not avoid the policy." 6 Lee R. Russ and Thomas F. Segalla, *Couch on Insurance* § 84:9 (3d ed. 2009).

This rule has been explained on the basis that, while parties to an insurance contract should act in good faith, it is reasonable to place the obligation and duty upon the insurer to determine and advise the applicant or the insured what information the insurer must have before it will consider whether or not to insure the risk, and since the insured normally is a lay individual and not particularly knowledgeable in the field of insurance risks, it is unreasonable to impose on the insured the continuing duty to notify the insurer of any change which would materially affect the acceptance or continuation of the risk.

*Id.*

The facts of the case before us demonstrate the valid concerns discussed above regarding the difficulty an insured might face in determining what facts are subject to sua sponte disclosure. Mr. Adams' application contained thirty questions to be answered on behalf of the applicant and all residents of the household regarding a wide range of information. For example, the questions included, among other things, whether any of the aforementioned persons had ever had any type of loss (insured or not), had any pending legal action or insurance claims, had any unsatisfied judgments, had ever filed bankruptcy, had mortgage payments behind, had been charged with a felony, arson, fraud, theft, or drug related charge, whether the property had any unrepaired damage, and whether any dogs were

kept on the property.[8]  Would the insured be expected to notify Tennessee Farmers if any resident of the household experienced a change in any of these circumstances or risk voiding the policy?

The application required the applicant to warrant that the information and answers provided were "true, correct and complete for all applicants and residents of the household," and it provided that "any misrepresentations or failure to fully complete all questions truthfully and fully will void this insurance."  However, it made no mention of a requirement that the insured update the information during the policy period.  The renewal certificate issued by Tennessee Farmers contained a "Notice to Policyholder" instructing him to contact his local agent "if, during the past year, you have acquired any valuable property items or made any improvements to insured property," but it did not request any additional information.

Again, "[i]t is established in Tennessee that a representation made in an application for insurance is a continuing affirmation of the truthfulness of such representations *until the policy is delivered*."  **Lawless**, 586 S.W.2d at 470 (citing *Indep. Life Ins. Co.*, 80 S.W.2d at 847).  Regarding information after the policy has issued, we agree with the Courts of Massachusetts and Maine in their conclusion that the burden is more appropriately placed on the insurer to specify when the insured will be required to notify it of changes in circumstances after the policy is delivered.  Because this policy contained no such obligation, we find that Mr. Adams had no duty to disclose the change in legal ownership subsequent to the issuance of the policy.

### D.    Post-Loss Conduct

Next, Tennessee Farmers argues that the trial judge erred in determining that Mr. Adams did not violate the "Concealment or Fraud" provision of the policy through misrepresentations on his Sworn Statement in Proof of Loss.

After the fire, Mr. Adams completed a "Sworn Statement in Proof of Loss" in which he provided the following answers:

3.    Named insured(s): <u>Kevin Adams / Lola Adams – Divorce – see attached</u>

. . . .

9.    **TITLE AND INTEREST:** At the time of the loss, the described property was owned by: <u>J. Kevin Adams</u>

---

[8] Question 13 of 30 asked whether any other party had an ownership or other interest in the property.

-16-

10. No one else or other institution had any interests in, liens, mortgages, or encumbrances upon the described property except: <u>None</u>

11. **OCCUPANCY AND USE:** At the time of the loss, the following person(s) occupied or resided at the described property: <u>Joseph Kevin Adams</u>

12. The described property was used for the following purpose(s): <u>Living</u>

13. **CHANGES:** The only change(s) in use, occupancy, location, possession, interest, title, or risk exposure that have occurred since this policy was issued are described as follows: <u>Divorce, J. Kevin Adams – see attached papers</u>

<u>      </u>. . . .

Tennessee Farmers contends that several of these statements constituted misrepresentations in violation of the "Concealment and Fraud" provision discussed above, and therefore the policy is void.

Fraud in the claims process can prevent recovery on a policy. *Wilder v. Tenn. Farmers Mut. Ins. Co.*, 912 S.W.2d 722, 725 (Tenn. Ct. App. 1995). However, "false statements or false swearings made subsequent to the issuance of the policy and in connection with a loss are treated differently than those made in the application for insurance." *Joyner v. Omaha Prop. & Cas. Ins. Co.*, No. 02A01-9301-CV-00021, 1993 WL 295049, at *3 (Tenn. Ct. App. W.S. Aug. 4, 1993).

> When the false swearing is in the application it forms the basis upon which the contract rests, and if fraud enters into it the policy would be voided even though the policy does not so provide. But after the loss occurs then voiding the policy is in the nature of a penalty or forfeiture; in other words, in such cases the holding is virtually that, although the insured has had a loss, and may be entitled to recover from it, yet, as he has been guilty of fraud in the proofs, he must have his policy vacated and set aside as a punishment for such fraud, or attempted fraud. In the latter case, as in all cases of forfeiture, a strict construction should be adopted, and the forfeiture not enforced except on the plainest grounds, *if at all*.

*Nix v. Sentry Ins.*, 666 S.W.2d 462, 464 (Tenn. Ct. App. 1983) (quoting *Boston Marine Ins. Co. v. Scales*, 49 S.W. 743, 746 (Tenn. 1899)). When an insurer raises the defense of fraud in connection with a claim made subsequent to the issuance of a policy, in order to void the policy, the false statements must be willfully false in some material matter and made with intent to deceive the insurer. *Joyner*, 1993 WL 295049, at *5; *Nix*, 666 S.W.2d at 464; *Baker v. Nationwide Mut. Fire Ins. Co.*, 646 S.W.2d 440, 443 (Tenn. Ct. App. 1982). The insurer has the burden of proving that the insured intended to deceive or defraud the insurer.

-17-

***Wassom v. State Farm Mut. Auto. Ins. Co.***, 173 S.W.3d 775, 783 (Tenn. Ct. App. 2005). Intent to deceive is a question of fact. ***Joyner***, 1993 WL 295049, at *5.

After Tennessee Farmers discovered the deed from Mr. Adams to his sons, Mr. Adams was examined under oath regarding his claim pursuant to the policy. Mr. Adams was asked various questions about the conveyance and why he conveyed the property to his sons, to which he responded, "I ain't got a clue about what I done back then." When asked about another deed, he stated, "it's been mine all along. It's just I don't remember the circumstances of stuff how we did the things we done . . . ." Mr. Adams said "all my stuff burned up," and that he was able to figure out the circumstances surrounding the various deeds once the lawsuit progressed and all the paperwork was compiled for him to review. When he was asked about inconsistencies in his statements about the conveyance to his sons, Plaintiff explained that he had been confused about the circumstances surrounding the various deeds for some time. He stated, "Well, when everything burned up – I don't remember dates. I don't remember all this stuff going on, and then when you come up here and start asking me specific dates about something happened at this exact time and stuff, there is no way I remember none of this of what time, particular time this happened."

On appeal, Tennessee Farmers cites Mr. Adams' testimony from trial[9] and claims that "[t]here is no other conclusion but that these false statements [on the Sworn Statement in Proof of Loss] were made with intent to deceive." Mr. Adams testified that he relied upon the introductory part of the question on the Sworn Statement in Proof of Loss, which stated, "Title and Interest," when answering the question. Mr. Adams said, "I had the interest because I bought the darn place and I paid for everything." When counsel for Tennessee Farmers stated his opinion that Mr. Adams did not have any interest in the property, Mr. Adams said that that was how he interpreted the question, and that he did not lie about anything. He continued,

> That title in interest, I don't see – I'm taking it I had interest in it as far as I'm concerned. That's the way I interpreted the darn question.

---

[9] We question the propriety of considering trial testimony regarding this issue because the trial judge found, at the summary judgment stage, that "[Mr. Adams] did not conceal or misrepresent material facts, and therefore did not violate the Concealment and Fraud provision of the insurance policy as a matter of law." However, the court *denied* both parties' motions for summary judgment. At trial, the judge stated that he stood by his ruling for purposes of the motion summary judgment, but he went on to allow Tennessee Farmers' counsel to question Mr. Adams about the statements on the Sworn Statement in Proof of Loss, stating, "this area remains open because there are a lot of issues I haven't ruled on."

In any event, we find that even considering the trial testimony Tennessee Farmers cites on appeal, it does not entitle Tennessee Farmers to relief, as it clearly indicates that Mr. Adams did not intend to deceive Tennessee Farmers.

And the changes, the only change, I got divorced, but other than that, I mean, I don't know what they mean by the question. I mean, I – I'm a construction worker.

They word stuff and put stuff down here, they can interpret it any way, but I tried to read it and answer it to the best of my knowledge, and I – you know, that's all I'm doing.

In sum, the evidence suggests that Mr. Adams either made an honest mistake or had a lapse of memory. There is no evidence in the record to establish "on the plainest grounds" that Mr. Adams' statements were made with the intent to deceive Tennessee Farmers. *See Nix*, 666 S.W.2d at 464. Therefore, Tennessee Farmers has failed to carry its burden of proving intent to deceive.

### E.    *Award of the Policy Limits*

Next, Tennessee Farmers contends that the trial court erred in awarding Mr. Adams the full policy proceeds when he was occupying the property but lacked legal or equitable title. As stated above, the policy provided:

**Conditions Applying to SECTION I**

Insurable Interest

If more than one person or entity has an insurable interest in covered property and **we** are obligated to pay for a loss to the covered property, **we** will pay only the **insured's** individual interest in the covered property at the time of loss up to the applicable limit of liability.

Tennessee Farmers contends that the value of Mr. Adams' interest in the property should not be equal to that of an owner of the property. However, it does not suggest a lesser value to be placed on Mr. Adams' interest. Instead, Tennessee Farmers continues to argue that Mr. Adams had no insurable interest and, therefore, was entitled to no damages. Mr. Adams, on the other hand, claims that it was proper to award him the full policy limits because he and his sons treated the property as his, and Mr. Adams was the only person who suffered a loss from the destruction of the property. Shane and Dustin submitted affidavits stating that they had never claimed any ownership interest in the property, and that they simply accepted legal title or deeded it away as directed by Mr. Adams. Shane stated that he had never permanently resided at the property, and Dustin stated that he had not resided there in the ten years prior to the fire. Both sons stated that it was Mr. Adams who suffered a loss when the property burned, not either of them.

We find the following statement by the Supreme Court of Oklahoma to be helpful in

this context:

> The purpose of the insurable interest requirement must stand at the center of any analysis of the doctrine's application. This is so whether the inquiry concerns the complete presence or absence of an insurable interest or whether, as here, it concerns the extent or measure of an insurable interest. Judicial consideration must be given to whether the contract suggests an element of wager on the part of the insured, i.e. whether it appears that the insured was betting on the loss of property with which he (or she) had little or no connection. The court must also consider whether recovery by the insured would exceed the loss actually suffered, thereby providing motivation for destroying the property. The insurable interest requirement should not be extended beyond the reasons for its existence by an overly technical construction that frustrates the legitimate expectations of the insured or that permits an insurer to avoid the very risk it intended to insure.

*Delk v. Markel American Ins. Co.*, 81 P.3d at 637. "[I]n most of the cases where it is apparent that to allow the insured to recover the full value of the property destroyed, within the amount of the policy, would enable him or her to realize a profit on the insurance, the courts have limited the recovery to the value of the actual interest of the insured in the property destroyed." 44 Am. Jur. 2d *Insurance* § 1505.

The Supreme Court of Alabama faced a comparable situation in *Ford v. National Security Fire & Casualty Co.*, 594 So.2d 46 (Ala. 1991). A mother purchased a fire insurance policy to insure her residence, which provided that it would not provide coverage "in any event for more than the interest of the insured." *Id.* at 47. The deed listed the mother, her son, and her daughter-in-law as owners of the property, and all three parties' names were listed on the mortgage as well. *Id.* The house was heavily damaged by fire, and damage to the property was stipulated to be $18,000. *Id.* The insurance company claimed that its liability was only $6,000 (one-third of the loss) because the policy holder, the mother, only held a one-third interest in the property. *Id.* According to the insurer, the policy limited its liability to an amount equal to her one-third interest. *Id.* The son and daughter-in-law testified that they never intended to own any interest in the house and that they meant to sign the mortgage and deed only as co-signors. *Id.* Further, they never lived in the home, never made mortgage payments and insurance payments, and never paid taxes on the property. *Id.* Considering the realities of the parties' situation, and construing the liability-limiting language of the policy narrowly in favor of the insured, the Court concluded that the insurer was required to pay $18,000 "for the entire loss suffered by [the mother]." *Id.*

Similarly, under the unique facts of this case, we cannot say that the trial court erred

in concluding that it was Mr. Adams who suffered the entire loss when the residence burned. This is not a case where recovery of the policy limits would exceed the loss actually suffered. Tennessee Farmers did not dispute that the fire resulted in a total loss, and that if Mr. Adams had an insurable interest and coverage existed, the proper measure of damages was $72,500. In addition, under the facts of this case, the risk Tennessee Farmers assumed is the risk it incurred. Tennessee Farmers intended to enter into a contract of indemnity for the full value of the home up to the coverage limits. To deny recovery of the policy limits would "frustrate the legitimate expectations of the insured" and allow the insurer to "avoid the very risk it intended to insure." *Delk*, 81 P.3d at 637. Therefore, we affirm trial court's award of the full policy limits.

### F. Discretionary Costs

The trial judge awarded discretionary costs to Mr. Adams, as the prevailing party, in the amount of $2,933.20 for court reporter expenses for depositions and the trial. Tennessee Farmers challenges this award on appeal.

An award of discretionary costs may include "reasonable and necessary court reporter expenses for depositions or trials." Tenn. R. Civ. P. 54.04(2).

> [W]hen deciding whether to award discretionary costs under Tenn. R. Civ. P. 54.04(2), the courts should (1) determine whether the party requesting the costs is the "prevailing party," (2) limit awards to the costs specifically identified in the rule, (3) determine whether the requested costs are necessary and reasonable, and (4) determine whether the prevailing party has engaged in conduct during the litigation that warrants depriving it of the discretionary costs to which it might otherwise be entitled. The courts should not, however, base their decisions to award costs under Tenn. R. Civ. P. 54.04(2) on (1) a desire to punish the losing party, (2) whether the prevailing party is the plaintiff or defendant, or (3) the weight given to a particular witness's testimony.

*Trundle v. Park*, 210 S.W.3d 575, 582 (Tenn. Ct. App. 2006) (quoting *Mass. Mut. Life Ins. Co. v. Jefferson*, 104 S.W.3d 13, 35-36 (Tenn. Ct. App. 2002)). "'Pursuant to [R]ule 54.04, trial courts are vested with wide discretion in awarding discretionary costs, and this court will not interfere with such an award except upon an affirmative showing that the trial court abused its discretion.'" *Id.* (quoting *Sanders v. Gray*, 989 S.W.2d 343, 345 (Tenn. Ct. App. 1998)).

Tennessee Farmers contends that Mr. Adams engaged in deceptive conduct during the

litigation so that the trial court should have refused to award discretionary costs. In Mr. Adams' complaint and during written discovery, he maintained that he had informed his insurance agent about the deed to his sons. However, during his deposition, Mr. Adams testified that his previous statements were incorrect, and that he had informed his insurance agent about a different transaction. At trial, Mr. Adams testified that he had been confused about the circumstances surrounding the various deeds, and that he initially thought that he had informed his agent about the conveyance to his sons. He explained that he had been on a lot of medication and was not thinking clearly. The trial judge, having observed the parties' conduct throughout the course of the proceedings, specifically found that Mr. Adams had not engaged in conduct during the litigation that warranted depriving him of discretionary costs. We find no abuse of the trial court's discretion and affirm the award.

### G. Prejudgment Interest

Mr. Adams contends that the trial court erred in declining to award prejudgment interest. Tennessee Farmers' only argument against such an award is that Mr. Adams engaged in deceptive conduct, which we have already addressed.

Tennessee Code Annotated section 47-14-123 provides, in relevant part:

> Prejudgment interest, i.e., interest as an element of, or in the nature of, damages, as permitted by the statutory and common laws of the state as of April 1, 1979, may be awarded by courts or juries in accordance with the principles of equity at any rate not in excess of a maximum effective rate of ten percent (10%) per annum. . . .

An award of prejudgment interest is within a trial court's sound discretion. *Hunter v. Ura*, 163 S.W.3d 686, 706 (Tenn. 2005); *In re Estate of Ladd*, 247 S.W.3d 628, 645 (Tenn. Ct. App. 2007). The purpose of prejudgment interest is not to penalize a defendant for wrongdoing, but to fully compensate a plaintiff for the loss of the use of funds to which he or she was legally entitled. *Hunter*, 163 S.W.3d at 706 (citing *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998)). "The trial court must consider whether the amount of the obligation was certain or ascertainable and whether the existence of the obligation was disputed on reasonable grounds." *Id.* However, these are only two of the factors to be considered when deciding whether prejudgment interest is, as a matter of law, equitable under the circumstances. *Id.* "The uncertainty of either the existence or amount of an obligation does not mandate a denial of prejudgment interest[.]" *In re Estate of Ladd*, 247 S.W.3d at 645 (citing Tenn. Code Ann. § 47-14-123; *Myint*, 970 S.W.2d at 927). Basically, the trial court must decide whether awarding prejudgment interest is fair, given the circumstances of the case. *Id.* In recent years, the Supreme Court has "shifted the balance

to favoring prejudgment interest 'whenever doing so will more fully compensate plaintiffs for the loss of use of their funds.'" *Id.* (citing *Scholz v. S.B. Int'l Inc.*, 40 S.W.3d 78, 83 (Tenn. Ct. App. 2000)).

> Fairness will, in almost all cases, require that a successful plaintiff be fully compensated by the defendant for all losses caused by the defendant, including the loss of use of money the plaintiff should have received. That is not to say that trial courts must grant prejudgment interest in absolutely every case. Prejudgment interest may at times be inappropriate such as (1) when the party seeking prejudgment interest has been so inexcusably dilatory in pursuing a claim that consideration of a claim based on loss of use of the money would have little weight; (2) when the party seeking prejudgment interest has unreasonably delayed the proceedings after suit was filed; or (3) when the party seeking prejudgment interest has already been otherwise compensated for the lost time value of its money.

*Id.* (quoting *Scholz*, 40 S.W.3d at 83).

Again, awards of prejudgment interest are within the trial court's sound discretion. *Hunter*, 163 S.W.3d at 706; *In re Estate of Ladd*, 247 S.W.3d at 645. "Generally stated, the abuse of discretion standard does not authorize an appellate court to merely substitute its judgment for that of the trial court." *In re Estate of Ladd*, 247 S.W.3d at 645 (citing *Myint*, 970 S.W.2d at 927). "However, appellate deference is not synonymous with rubber stamping a trial court's decision." *Id.* A trial court's discretionary decision remains subject to appellate scrutiny, albeit less strict, in that we will determine whether the trial court based its decision on applicable legal principles and whether the decision is consistent with the evidence. *Id.*

In this case, the trial judge explained his decision to deny prejudgment interest as follows:

> Enough said. I mean, when I heard this case, I noted that this is one that sometimes we just have to try them, and this is one. There was some application language that we were looking at that could cause some confusion.
> The facts were different from what you face every day, and it had to be tried. There appeared to be no bad faith on anyone's part in the delay . . . .
> I just don't think – it would be easy to set prejudgment interest because it is liquidated damages at this point, but I really don't feel like in my discretion it ought to be granted because this is one that just had to be tried, and nobody was acting in any type of bad faith, and enough said. I'm going

to deny it.

Thus, the trial judge concluded that the claim was reasonably disputed and that neither party acted in bad faith. However, as explained above, the uncertainty of the existence of an obligation does not mandate a denial of prejudgment interest. *See **In re Estate of Ladd***, 247 S.W.3d at 645. Furthermore, it is not necessary that the defendant has acted in bad faith. The purpose of prejudgment interest is not to penalize the defendant for wrongdoing; it is to fully compensate a plaintiff for the loss of the use of funds to which he or she was legally entitled. ***Hunter***, 163 S.W.3d at 706.

Other considerations are relevant to the issue as well. Mr. Adams did not have use of the money to which he was entitled while it was in Tennessee Farmers' possession. Mr. Adams did not unreasonably delay in pursuing his claim, as he filed his complaint for breach of contract within four months of Tennessee Farmers' denial of his claim, and the trial was held just thirteen months after the complaint was filed. Also, the amount Mr. Adams was claiming pursuant to the policy was easily ascertained. Finally, Mr. Adams has not otherwise been compensated for the loss of use of these funds. Prejudgment interest is favored when it will more fully compensate the plaintiff for the loss of use of his funds. ***Scholz***, 40 S.W.3d at 83. "Fairness will, in almost all cases, require that a successful plaintiff be fully compensated by the defendant for all losses caused by the defendant, including the loss of use of money the plaintiff should have received." ***Id.*** Accordingly, we vacate the portion of the judgment denying Mr. Adams' claim for prejudgment interest and remand the case with directions to calculate and award Mr. Adams the prejudgment interest to which he is entitled.

## IV.  CONCLUSION

For the aforementioned reasons, we affirm the circuit court's award to Mr. Adams under the policy, and its award of discretionary costs, but we vacate the portion of the judgment denying his request for prejudgment interest. This case is remanded to the trial court for further proceedings consistent with this opinion. Costs of this appeal are taxed to the appellant, Tennessee Farmers Mutual Insurance Company, and its surety, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.